Good morning, ladies and gentlemen. Our first case of the morning is case 118422, the State of Illinois v. American Federation of State, County and Municipal Employees Council 31. Are you ready to proceed? Happily ready? The floor is yours. May it please the Court, I am Assistant Attorney General Richard Hussain, Counsel for the State, and I urge the Court to reverse the Appellate Court's judgment because it errs in two respects. It misinterprets the Public Labor Relations Act to mean the opposite of what it plainly says and what the General Assembly clearly intended by eliminating the provision in Section 21 that makes collective bargaining agreements for state employees subject to the appropriation power of the General Assembly. And second, the Appellate Court judgment violates the appropriations clause of the Illinois Constitution. At the heart of this case are issues of great importance regarding the separation of powers among the different branches of state government. And in this case in particular, the power to appropriate public funds to determine how much shall be spent out of the state treasury for what purposes. The essence of the union's position in this case, and I'll refer to it simply as AFSCME, which the Appellate Court adopted and we asked the Court to reject, is that the Public Labor Relations Act validly and constitutionally gives the Governor the unqualified ability to make judicially enforceable commitments to spend an essentially unlimited amount of public funds without an appropriation by the General Assembly. The circumstances that gave rise to the disputes in this case relate to fiscal year 2012 and the fact that the General Assembly appropriated for personal services for state employees covered by the AFSCME contract, which covers most of the agencies under the Governor's jurisdiction, less than was necessary to accomplish two separate things at the same time. To fulfill the wage increase and salary increase provisions that were included in the collective bargaining agreement for that year, which were approximately 5.5% plus longevity and step increases, and to keep a complete head count, full-time employment of all the current employees. There wasn't enough money in the appropriations. I asked a question about the appropriation. Please do. Back question. Yes. I couldn't tell from the briefs. Was this a lump sum kind of appropriation? We see from the briefs that a decision was made in the Governor's office to apply the cost of living increases to 39 agencies and not to 14. Later it became 10. Later it became 6. My question is, where did that decision come from? Was that how the appropriation was originally structured, or how did that happen? That's an important question, and I don't think the answer is going to change the focus of the Court's relevant analysis. But without going into all the details, the appropriations were essentially done on an agency-by-agency basis and often on an operation-by-operation basis, either by facility or nature of program or activity. And that is how it has historically been done, but not always done. So for fiscal year 2012, looking at the full headcount for many of the agencies, there was enough money in the appropriations to provide for the salary increases and wage increases provided in the collective bargaining agreements and also to fulfill a separate provision that had been negotiated as an amendment to the collective bargaining agreement, under which it was provided that the Governor would not impose any furloughs, layoffs, or facility closures. So for that majority of agencies, there was enough money to keep both of those commitments, and that was done. For these 14 agencies, the Governor's Office of Management and Budget, based upon looking at the prior year's operations and expenditures, said, we can't do both of these things. And so at the beginning of the year, they said, for these agencies, we can't both not lay anybody off and pay you the wage increases. Something's got to give. And what they did was they said, we have an appropriation for the full fiscal year. We're going to fulfill our mission for the fiscal year, and we will apply that by essentially not implementing the wage increases. The General Assembly later made some supplemental appropriations for some of the agencies. There was also an unexpected level of some early retirements in some of the agencies, and that enabled the Governor, who was essentially overseeing the process by these agencies, to say, okay, well now we'll make a whole or essentially fulfill that commitment with respect to those other agencies out of the 14. That left six that had insufficient funds in the legislative appropriations to pay, to fulfill the no layoff, no furlough clause, and to meet the wage increase commitments and the collective bargaining agreements. AFSCME points out that there was one agency, the Department of Human Services, for which some of the appropriations were in the nature of a lump sum. It had not always been done that way. But for two categories of facilities, the mental health facilities, where people are detained, involuntarily committed, and otherwise provided services by the state, and the developmental disability program, essentially everybody in which is receiving funds for the Medicaid program, which has federal standards that have to be met. For those two categories of facilities, the initial appropriations, lump sum, not all of DHS appropriations, but for those two categories of facilities, the lump sum appropriations were approximately 85% of the actual expenditures for 2011. There was a 15% cut in the total appropriations for those facilities. And so there was not only a difficulty in being able to meet the promised wage increases, but also there was a difficulty in trying to figure out how to implement those agencies' programs without closing facilities, which is what another thing in the collective bargaining agreement said could not be done. Later, there was a supplemental appropriation to keep those facilities open through the end of the fiscal year. The legislative intent shows that that supplemental appropriation was intended not to include any money for the wage increases. And there was some minor adjustment and reallocation among some of the appropriations within DHS within the limits of the Finance Act. If there's unexpended funds, there's like a 2% limit under the Finance Act, pursuant to which an agency can take some of their operational funds, not their grant money, and I can dig out the details if you're interested in that, but they can reallocate up to that 2% of unexpended for other purposes. They did so. After all that was done, even in the lump sum category for these two categories of facilities for DHS, there was a substantial shortfall. The total appropriations, after everything was said and done, were within less than 1% of the prior year's actual expenditures for all those facilities. So there was no way that they could be kept open through the fiscal year without facility closures, with no layoffs and no furloughs, and pay the roughly 6% wage increases on average if you calculate the step in longevity and cost of living increases that were scheduled into the program. Does that answer your question, Justice? I have one more fact question and then I'll stop. The appellate court opinion begins with mootness and indicates that the state did make payments pursuant to the trial court's order. And the question is, where are we on that? Is this issue moot? Have the payments been made? Some payments were made with respect to the lapsed funds process where there are unexpended funds in a given year. The circuit court directed that those lapsed funds, to protect them, be put into an account and then ultimately they were used to pay some but not all of the claimed wage increases in this case. And the stipulation among the parties is that the shortfall between what AFSCME claims and what was paid to the affected employees is almost $53 million. I think that prevents this case from being moot. You have a $53 million dispute, the appellate court said pay it over, even without an appropriation by the General Assembly. Our position is no, that can't be done. We have two obstacles in the way. One is the Public Labor Relations Act says that collect barter agreements are subject to the appropriation power of the employer. And two, the Appropriations Clause of the Illinois Constitution makes it clear that the power of the purse is vested exclusively in the General Assembly. And the notion that you can simply send a wrecking ball into that edifice of the separation of powers that's constitutionally created and give an executive branch official an unqualified ability to commit to an unlimited quantity of public funds at the collective bargaining table is wrong as a matter of statutory interpretation and also as a constitutional principle. I'd like to add, please, Justice Burke. Does the state's position essentially render the labor agreements like this one at issue meaningless? Not at all, Your Honor. And I think that is ultimately a policy argument about the nature of the negotiations that happen at the bargaining table for public sector employment. But there is a large body of case law that establishes that this form of public contracting is the norm. It's effectively a function of the separation of powers in government so that executive branch officials who are normally given the authority to negotiate agreements have to do so subject to the ultimate authority of the legislative branch that determines appropriations. That's true for multi-year construction contracts. That's true for multi-year procurement contracts for goods and services. And as this Court indicated in its decision in the Arenek v. Cook County Board case, that's also true in connection with public sector labor relations. So the negotiations are somewhat different if you can't be confident that the person at the other side of the table can absolutely commit to buying the state to spend a certain amount of money. But that's partly a function of the way that government is different from the private sector. And it hasn't prevented the government from doing all sorts of things with contracts through the years. So, Mr. Hussig, it appears that your answer to the point made by Asmy's attorneys that meaningful collective bargaining necessarily requires that negotiations occur with decision makers that have authority to make binding commitments is the overarching understanding that it's subject to the legislature making the appropriation. That's absolutely correct. It's a common feature of public contracts generally. It's a common feature of public sector labor negotiations generally. And I'm sure as a policy matter, the union would prefer to have the governor or his or her representative have the unqualified authority to make a financial commitment regardless of appropriations. But we live under a regime where the Constitution has given the legislature that power. And that makes sense because that is the branch of government whose members are most accountable politically to the voters for those sensitive decisions about how to spend public money for various things. This is an unusual case only because against the background of the recession and declining state revenues and intense competition for resources among the various constituent groups, Asmy convinced the governor to agree to the no layoff provision and the no furlough provision. Typically if the legislature funds less than would be necessary to pay wage increases at the compensation rates for a full headcount, then what happens, and Asmy admits that historically that's what has happened, is that the governor then works towards a process of imposing either furloughs or layoffs or facility closures typically in consultation with the unions and their members. If the legislature exercising the power of the purse says, we're not going to give you as much as you wanted, then the process normally is you move towards furloughs, layoffs, whatever. In this case, the union, instead of getting the legislature to commit the level of appropriations necessary to meet those salary and wage increase commitments and avoid any layoffs, went to the governor instead. They didn't get the appropriations that they would have liked to fulfill both of those purposes. They went to the governor and said, why don't you paint yourself into a corner, promise these wage increases and promise that there will be no layoffs, and then their position is that not having gotten the appropriations from the legislature, that doesn't matter. The courts can step in and enforce the governor's commitments without an appropriation. And our position is that both as a matter of statutory interpretation and as a constitutional matter, you can't do and run around the legislature's ultimate authority to determine what public funds are spent for what purposes. Following up on Justice Tice's original question and your response, and just to clarify for me, is it implicit or perhaps explicit in Askme's argument that the footprint of the budget was large enough to accommodate the collective bargaining agreement and the increase in wages? And exactly what is that argument, if that is the argument? I'm a little confused by the argument because they refer to the budget as some type of different aspect of the legislative appropriations process in several respects. So I'm going to try and touch upon each of the ones that you think may be relevant to this. Does that mean the entire budget, if it's large enough somehow to accommodate this, then other agencies have to decide which one, maybe other things to cut that are not affected by the collective bargaining agreement? Well, I'm not sure exactly how to answer that because ultimately you have to go back to what the legislature appropriates. You cannot argue that if the legislature appropriated more funds for hospital construction than somebody thinks was wise, that you can just invade that appropriation and use it to pay for wage increases that were the subject of a separate appropriation. That's not how the appropriation process works. Now, under the 1870 Constitution, there was a requirement of great specificity, almost granular specificity to the appropriation requirements, and this court's case law from that era releases that requirement. In 1970, they did away with that. They simply said the legislature can describe where money shall be appropriated, and as long as they do so, then we will honor those determinations. But nothing gives anybody the power to disregard the boundaries drawn among different appropriations and say as long as there's some money elsewhere outside the appropriation for this purpose, it's fair game to grab it and use it for a different purpose. I mean, then the courts would turn into some type of bankruptcy court where if the plaintiff's thesis is correct and the executive branch has this unlimited power to commit the expenditure of public funds without an appropriation, we're not going to just be transferring the appropriation power to the executive. We're going to be transferring it to the courts. They're going to be figuring out among which of the various contracts that exceed the legislative appropriations who gets a priority. And then they're going to look among those contracts and see how they rank compared to the statutory entitlements for food stamps or welfare or Medicaid or anything else. And then they're going to have to figure out the timing process and out of what account the money comes. There's a reason why political accountability for these purposes is vested in the legislature. They have to answer to the voters at every election why we spent the money we did and why we raised the revenues we did. Those are critical issues, and they should not be ones that get spilled over under our constitutional scheme to the executive branch, and ultimately when disputes inevitably arise, dumped in the lap of the courts to try and sort out disagreements about claims that there should be more spent for some purpose than the legislature ultimately appropriated for that purpose. Now, of course, even the Appropriations Clause has its exceptions. The Federal Constitution, the provisions of the Illinois Constitution that directly require spending for certain purposes, we've alluded to those in their briefs. We're not disputing that. What we're saying is in this case for garden variety contracts, the legislature cannot delegate its appropriation power to the executive, and it did not do so. And the arguments that the Public Labor Relations Act actually violates the Appropriations Clause as opposed to ensuring the preservation of the Appropriations Clause, we believe are unconvincing for the reasons we have given in our briefs. Unless the court has additional questions about the other arguments we made in our brief about the validity and enforceability of the arbitrator's decision in this case, we will rest on our arguments in our brief. I do want to add one point about the lump sum appropriations to highlight the manner in which the allocation by the executive was done within the scope of that lump sum appropriation, and that is that approximately 90% of all of the expenditures for those two categories of facilities that were within those lump sum appropriations, mental health and developmental disability, goes to payroll. 10% is left for food, medical services, lights, heat, water. If another 6% had gone to wage increases, what do you do? Stop feeding the residents? Turn off the lights? Cut off the water? The governor did the only thing that the governor could do in those circumstances, and after the fact to say that no, you know, the money should have gone to the employees for wage increases we think is unconvincing on the circumstances of this case. Thank you, Your Honors. Thank you. May it please the Court, my name is Stephen Jokic. I represent AFSCME Council 31. They're the defendant appellee in this case, and we believe that you should affirm the decision of the appellate court. I'm going to get to the points that the Attorney General raises in his argument, but before I get to those specific points, I think it's important for the court to focus on the factual aspects of this case. This case comes up on review of an arbitration award. The review of an arbitration award, even on public policy grounds, is a very narrow review, and as Justice Freeman wrote in AFSCME versus Central Management Services almost two decades ago, the review on public policy grounds requires the court to accommodate balancing interests, to look at the interests in favor of enforcement of a collective bargaining agreement and enforcement of collective bargaining law versus the public policy interests that are asserted by the employer. And I think if you look at the specific facts of this case and you engage in the balancing of interests that's required in these cases, you'll find that the balancing of interests squarely requires affirmance of the arbitration award. The parties entered into a collective bargaining agreement in 2008. It started in September. That was in fiscal year 2009. Shortly after the contract, the economy went off a cliff and state revenues declined. And the parties met after the governor announced 2,500 layoffs and facility closings to try to negotiate an agreement that would preserve the wages and job security of the members represented by the union. And the union made concessions in its contract. In fact, the layoffs that were proposed by the governor would have saved the state $115 million in fiscal year 2011. The union made concessions of $300 million. The layoffs proposed by the governor would have cut 2,500 people from their jobs. Because of the concessions that the union made, they were able to reduce the layoffs to 1,200. And the parties were also able to do some outside-the-box things because they met in anticipation of the declining revenue. They were able to make suggestions and institutionalize things that made the state more efficient to run. And that is another way that they got to the $300 million. And as part of that initial concessions agreement, the state and the union agreed that there would be no layoffs in fiscal year 11. Fiscal year 12 came around. And again, the union acted proactively. The union went to the governor and said, we are willing to make further concessions in order to have no layoffs and no facility closures in fiscal year 12. And in fiscal year 12, the union agreed to another $100 million in concessions. So over the life of the contract, there were $400 million of concessions that came out of the collective bargaining relationship in exchange for the deferral of the wage increases and the no layoff, no facility closing in this contract. So by no means in this case do you have a situation where the executive has gone to the bargaining table and made unqualified commitments that were outside the bounds of the revenue that the state was taking in. Rather, the facts reflect that the executive went to the bargaining table and the union went to the bargaining table and said, well, what is the state taking in? What is the history here? What can we do to make our agreements fit state revenue, preserve the essential state services, and at the same time preserve the job security of our members? Now fiscal year 12 came around. The General Assembly went through a budgetary process, and the budgetary process was set on a footprint, as we mentioned, of $33.2 million. Now the footprint is an aggregate number, but the reason why the footprint is important is that the argument of the state in this case is based upon the authority of the General Assembly to set the level and direction of state spending. And with regard to the level of state spending, there was nothing in the no layoff, no facility closing agreement that affected the level of state spending. And that's because they passed a budget in that footprint, and the governor, when he signed the budget, made $396 million in amendatory vetoes. That would have been enough to pay for the wage increases. And so there was nothing in this agreement that entrenched upon the General Assembly's power to affect the level of state spending. Now let's take that second point, the direction of state spending. The budget that was passed by the General Assembly was incomplete. It wasn't incomplete just because it wasn't sufficient to fund the wage increases. It was incomplete because even without funding the wage increases, there were 12 state agencies, including the Departments of Corrections, the Department of Revenue, and the Department of Human Services, that would have had to close their doors before the end of the fiscal year. With or without the wage increases, everybody to the process knew that they were going to have to come back and negotiate some more because otherwise you would have had to close the gates of state and let people out a month early. And the same was true even outside of the agencies that have large institutions. In the Department of Revenue, for example, the Department of Revenue was almost $50 million short. It could not have operated for the whole year. So the parties came back and it turned out that revenues were higher and it also turned out that the General Assembly thought that revenues were enough higher so that when it made its supplemental appropriation later in the year, it could actually enact tax decreases for certain select groups of taxpayers. The arbitrator heard the case. And the arbitrator's views of the law are really important, but the arbitrator's views of the necessary elements for productive collective bargaining are. The arbitrator observed that the history between the state and AFSCME was that the contracts had no contingency in them for the actions of the General Assembly. And that had been the history for 30 years. It was the history before the State Labor Relations Act. It had been the history since 1984 when the State Labor Relations Act went into effect. He observed that other state contracts between other state officeholders or between the governor and other unions had contingencies in them. And he observed that there were other contracts between AFSCME and the state that had contingencies in them based upon funding. And so he ruled that as a matter of contract interpretation, that when the parties to a contract have contingencies based upon funding, they should write those into the contract. And that's the black letter law in Illinois for non-government actors as well. The arbitrator also observed that multi-year collective bargaining contracts were integral to the collective bargaining process. And they're integral to the collective bargaining process for many, many reasons. And I'll just give you a couple of illustrations. They allow employees to plan their family budgets because they know that they will have some measure of job security or some measure of a raise. They allow the state to plan its budgets to provide essential public services without the threat of a strike every year if you have to renegotiate the contract. And they give the parties flexibility because if times are really bad right now, you can say, well, we'll hold off on a wage increase this year, but we'll give you a lump sum next year. You can trade off between years. And that's why a multi-year contract is something that you look at as a whole as opposed to a little piece of it. So the reason why the facts are important in this case is because the union did what a responsible representative should do. It stepped up to the plate, it made concessions, and it preserved the job security and wages of its members. Mr. Jokic? Yes. How would, if the union went into the contract negotiations knowing that it was contingent upon appropriations, which is not your position, obviously. You're saying the arbitrator even said it should be written into the contract, right? But if they did go in knowing, how would that change the tenor of the negotiations? It would change the tenor of the negotiations dramatically because you would know that there's somebody out there who's going to get another bite at your apple. You can't go into negotiations, and one thing we all do as lawyers is we negotiate things. You can't go to your bottom line if you know somebody else is going to come along and say, oh, we want an extra 1 percent or 5 percent. So it really makes it impossible. I don't understand with that being the basis. Give me a particular. I mean, would you say we need more because we don't know whether there's going to be, we need more in this area because we don't know whether there's going to be an appropriation? How would it change it? The union may have a good idea on how to make state government more efficient, and oftentimes when people hear efficiency, the bells go off and say, geez, I may get laid off. Well, if the union can bargain a no layoff agreement for a period of time to go with the proposal to make things more efficient, then it can make that deal. But if it knows that at the end of the day after it bargains that no layoff agreement that somebody's going to come along and make that no layoff agreement impossible to adhere to because it's not going to appropriate any money, it can't appropriate something that can make state government, it can't negotiate something that can make state government more efficient. But there are other contracts, and you acknowledge that, that have express language about the legislature's role. Yes. And those contracts get agreed to and move forward, and apparently the parties agree to the terms. Whatever happens, the parties adapt to it, all right? But I think if you look at this case, you'll see that both the governor and the union were acutely aware of the state's financial circumstances and negotiated a fit within those financial circumstances. And that is why if you take a look at the issue of public policy and you weigh what's in the Public Labor Relations Act versus the infringement upon whatever right the legislature has to set the directional level of state spending, I think that what's in the Public Labor Relations Act is entitled to great weight. The Labor Relations Act in this case says that employees are entitled to the full freedom of collective bargaining. And it specifically says that collective bargaining should happen before the budgetary process. And it contemplates that binding deals will be made before the budgetary process, that those deals will be enforceable in court, and that at the state level they'll be enforceable in court, especially because there's a waiver of state sovereign immunity. So the act contemplated that there would be the possibility of binding judgments in court that could be asserted against the state. How does that factor in separation of powers? We have three branches of government to deal with. We do have three branches of government. And the argument of the state is that the – let me take the argument in two steps, Justice. One step is what does the Constitution actually say? The Constitution says expenditures have to be by law. And under the case law in this state, that has come to mean it could be either by appropriation or it could be by judicial decree, that both of those things qualify as the law necessary to do expenditures. The second thing it says is that the General Assembly has the right to make appropriations. But we all know that there are significant exceptions to that, okay? So what we're into is weighing not an explicit constitutional prohibition, but we're into weighing the interest of the General Assembly in setting the level and direction of spending versus the interests of the union in asserting its rights under the Public Labor Relations Act. Now, what are the interests of the General Assembly in this particular case? Well, I've talked about a minute ago how the level of spending was not affected by the no layoff, no closing agreement in this case. The fact that the General Assembly enacted a budget that was demonstrably short indicates that it wasn't thinking about, well, should corrections, should this agency get more money or should that agency get more money? The budget would have required the Department of Human Services to close its institutions in April of the succeeding fiscal year. So it's hard to argue, given that context, that there was some substantial interest asserted by the General Assembly in particular priorities. It'd be one thing if the General Assembly said, hey, we need to move all of our money from corrections over to a program of street policing to prohibit, to stop people from getting into corrections in the first place. But there's no evidence in this record at all that these larger priorities or even that these smaller priorities were at issue. And that's why when you get into the process of accommodating the competing public policies in this case, then you can give decisive weight to the interests of the Public Labor Relations Act and to the constitutional interests cited by the appellate court in terms of the impairment of contracts under the state constitution. Let me ask you a question about your ideas about remedy, if we were to agree with you. The arbitrator here ordered the state of Illinois to pay in full in 30 days. So one question I have is, from where does the arbitrator derive that authority to order the state to pay that amount of money? Secondly, the court, the trial court, had a completely different kind of remedy and had this idea of a continuing obligation that sometime when the money was available, the state should pay. And then perhaps there's another idea out there that when such an impasse took place, perhaps the parties should have gone back to the bargaining table. So can you address, certainly, most importantly for me, the first point, but could you address the other types of remedies that were available here? So the first question, I think, is that the arbitrator gets his authority on remedy from the contract. And he has the authority to order the state to pay $75 million out of its coffers. He had the authority to say, yes, I think he does. And I think that just as he has the authority to say pay $10,000 to somebody who was unfairly discharged or a million dollars to people who didn't get a particular type of bonus or step increase, he's got the authority to say this wage increase is an enforceable contractual commitment. I think that's part and parcel of the waiver of sovereign immunity that you'll find in Section 27 of the State Labor Relations Act. I think the legislature contemplated that when they wrote the act. Now, with respect to, well, what happens after the arbitrator makes that award, you've really got a number of scenarios that can play out. One scenario is the scenario that the lower court will take. There's some sort of continuing obligation. And I would say that the continuing obligation, that the ability to pay, comes back into place when the no layoff, no closing agreement is placed. Because at that point, the state can say, okay, we're going to pay what's been required of us. And then whatever money they have left, they have. Now, you might say that's a lot of money. Since you're out of time, can I ask a question? What if the legislature does not fund the $75 million award? What happens then? Well, so we don't know what will happen if that happens. Now, you know, one case that I cited in my brief was the case from the Supreme Court of Iowa, and maybe they're more polite in Iowa, I don't know, where the court said, look, we're going to tell everybody what the law is, and then we're going to let the governor and the General Assembly work it out. And, you know, there's a chance that that could happen. One thing that has reduced the liability is that in the last fiscal year, as I indicated in my brief, the state did pass, and the governor did sign an appropriation to reduce the financial liability by half. But, you know, $75 million is a very big number, but it's a drop in the bucket in a $36 billion operating budget. Department of Corrections personnel budget for a year is $800 million, approaches a billion. Their liability in this case is $15 million or so. So if the arbitrators' award were to be in force, they would have to look at their current year's appropriation and find the $15 million needed to pay the correctional officers who didn't get their raises in 2012. And, you know, if we had to litigate this at a very granular level, what I would say is that at the trial court, we had a lot of evidence that the Department of Corrections had a special fund that it had $25 million in, that it says, well, we saved this money to do things like pay for court orders. Well, if there was a court order to pay, it could use the money in that section. I think it was Section 523 was the name of the fund. It could use the money in that fund to pay for the wage increases in this case. And so the way it played out in the trial court, all of this was litigated in front of the trial court, and you were asking the trial court to determine where the money was and how it should be spent. Our position was that they had an obligation to pay the whole kit and caboodle. The trial court ruled at an interim phase in the case that they didn't have that obligation. They only had to pay as much as they had. And so we had a whole trial of the trial court about what they had, and those were some of the facts that came out of that issue. So I went to a time management class a couple months ago, and in my time management class they said, if you have to eat a frog, do it at the very beginning part of your day. I thought that was good advice. In this case, the union ate two frogs. It ate a frog for fiscal year 2011. It ate a frog for fiscal year 2012. And what the attorney general is saying is it should have to eat a whole lot more. That's contrary to the policies of the Public Labor Relations Act. It's contrary to any notion of a deal is a deal. It's contrary to this court's constitutional policies with respect to impairment of contract. And that's why the appellate court decision should be affirmed in this case. Thank you, Mr. Jokic. Your time has expired. Thank you, Your Honors. I will refrain from bringing any other amphibians into this case if I can possibly avoid it. My distinguished opposing counsel, Mr. Jokic, makes several points to which I'd like to respond. In essence, he is trying to reduce the appropriations power given to the General Assembly by the Constitution to something that is not recognizable in light of the court's clear precedent in the language of the appropriations clause itself. He says it gives the General Assembly the general power to determine the level and direction of spending, but somehow when he describes the direction of spending, it seems to pay not too much attention to the language of the appropriations bills that specifies what purposes public funds shall be used for. And the trial court made findings of fact that are not challenged that the actual appropriations made by the legislature for the purposes that the plaintiffs claim, their kit and caboodle, are approximately $53 million less than the plaintiffs want to be paid. That money would have to come out of some other place than the actual appropriations for those purposes. So their argument essentially would, while they don't say so explicitly, drive a giant hole that you could run a Mack truck through for the appropriations clause. And in the scope of making these arguments about the General Assembly's decisions about not putting enough money into corrections and deciding that they could pass tax reductions for certain corporate purposes during this time period, they're inviting an analysis of the wisdom of the General Assembly's decisions. I think that is the last thing that the courts should be examining for purposes of determining whether there is compliance with the appropriations clause and what the Public Labor Relations Act means. Those decisions about the wisdom of the difficult decisions that the legislature makes belong to the voters at the ballot box. And if the legislature makes what are considered to be unwise decisions with respect to public spending, the voters should vote them out of office. And if they don't, those decisions are essentially not subject to review by the courts under some type of bankruptcy court process where there's going to be an evaluation made as to all the contracts that the executive branch agrees to on the theory that, oh, it doesn't really matter what the legislature appropriated for these purposes. The suggestion is that the arbitrators have balanced the various factors with respect to the public policy concerning the enforcement of this award. Just the opposite. The arbitrator said, I'm not a judge. I'm making no comment about the public policy issues in this. I'm not going to touch them. Leave the courts to decide what the meaning is of the Public Labor Relations Act and the appropriations clause. That's exactly what judicial review of arbitration decisions does. And we're asking this court to decide that question, which it is a question of law. Is the enforcement of this arbitration award against public policy? We think that there's no reasonable argument that it is consistent with public policy. If it violates the plain meaning of a statute governing these collective bargaining agreements, then it violates the appropriation clause of the Illinois Constitution. May I ask you, Michelle, to speak for a moment in the language of contract law? This is a contract, obviously. And you agree that this is not an issue of formation of contract. This is not an issue of consideration. Is there a breach of this contract? No. Our position is that this is well recognized as a part of contract law. It also exists in the private sector, although in a slightly different context. That is, for example, let's take you're a supplier of batteries to General Motors and you say to the person who provides you the acid or something for those batteries, I'm going to buy acid from you for my batteries, subject to the amount of batteries that General Motors orders from me. The scope of the obligation is determined by an outside event, not between the parties of the contract. In this case, the executive branch officials are essentially negotiating, and the outside event is the legislative appropriation process. The case law recognizes those contracts as valid, where the scope of the obligations is determined by that event. It's sort of like, you know, it's a two-key system, or it's sort of like the old epoxy glue that came in two tubes. You know, you put one tube down, and then when the legislature adds the other tube, then you've got something that sticks to the extent of that, but only to that extent. Does that answer the court's question? Mr. Hussig, let me ask you this. Is the logical extension of your position that AFSCME or other unions that negotiate with CMS should negotiate everything but wages and hold off and sit down with the governor and the legislative leaders? Is that where this is leading? I don't think so. No, I think that historically in the past, except for this agreement that has these no layoff clauses, typically the negotiation over salaries and compensation rates is properly conducted by the executive branch, and then the extent of the funding to fulfill those is determined by the legislature, and there may be furloughs or layoffs if it's less than the executive branch hoped for to keep everybody working at those levels. There's a tradeoff there. But even as Orenic indicates, and the entry court decision by the appellate court and the legion of other jurisdictions that have addressed this, there is essentially a two-step process, and the one process is you negotiate with the executive, but ultimately then an effort has to be made to get appropriations by the legislature, and what we're saying in this case is that that may be something that the union does not prefer as a policy matter, but it's necessary to honor the constitutional structure we have in our government, and ultimately if you can't get the legislature to fund all of your promises, you can't circumvent the legislature's responsibility there by just running to the courts. I mean, I suppose it's like the teenager who asks the mother, can I borrow Dad's car? And the mother says, well, did you ask Dad? And the answer is, yeah, he said no. Well, if the legislature says no or this is how much money you get, you can't get around that by simply saying, well, we struck a negotiation with somebody else who's part of this two-step process. And I want to make it clear that nobody is accusing the unions of bad faith in this case. I think the record is complete with the acknowledgement that they made earnest efforts to try and deal with the fiscal crisis facing the state. They negotiated with the governor to try and reduce expenditures and preserve jobs and income for their members. There's nothing wrong with that, but it cannot exclude the essential role of the legislature as the body that is vested by the Constitution and recognized in Section 21 of the PLRA as the additional person or body that's responsible for providing the appropriations necessary to fulfill those burdens. And it would be a disastrous policy to say that even on these sympathetic facts that we can disregard the plain meaning of the statute, that we can rewrite the appropriations clause contrary to existing longstanding precedent and the language of it to create an exception where the executive branch has this unlimited authority to commit to an expenditure of state funds without an appropriation by the General Assembly. Unless the court has any further questions, we urge that the appellate court's decision be reversed. Thank you so much. Thank you. Case number 118422, the State of Illinois, etc., Appellant v. American Federation of State, County, and Municipal Employees, Council 31, is that believed, will be taken under advisement as agenda number 18. Thank you, Mr. Huzak and Mr. Jokic, for your fine arguments this morning. You're excused at this time.